The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chrystal Redding Stanback. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except with the modification of Finding of Fact #25, and the deletion of Awards #3 and #4.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
STIPULATIONS
1. The parties entered into a Form 21 Agreement approved on September 27, 1990, wherein all necessary jurisdictional stipulations are contained, including a stipulation that plaintiff sustained a compensable injury by accident on June 11, 1990 resulting in carpal tunnel syndrome.
2. The Defendant employer was self insured.
3. Plaintiff's average weekly wage was $278.40 yielding a compensation rate of $185.61.
4. A Form 24 Application was approved by the Commission on June 13, 1991; this form was stipulated into evidence with attachments.
5. Defendants paid plaintiff compensation payments from July 24, 1990 through June 5, 1991.
6. Medical records of Dr. Larry G. Anderson were stipulated into evidence on September 27, 1994. (6 pages)
7. The issues for determination include:
 a. Whether the plaintiff was disabled from working as a result of her compensable disease after May 6, 1991;
 b. What, if any, further compensation is plaintiff entitled to, including permanent partial disability.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows, with the exception of a modification of Finding of Fact #25:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a sixty-five-year-old widow, born May 2, 1929. She is a high school graduate.
2. Plaintiff's prior work history includes working in a hosiery mill from 1949 to 1973 where she gave out work and answered the telephones. From 1973 to 1977 she worked part-time in a restaurant cleaning tables and washing dishes.
3. Plaintiff began working with defendant-employer Drexel Heritage on June 20, 1977 and worked for them continuously until July 17, 1990. While an employee of Drexel Heritage, she primarily worked on assembly lines, hinging doors and placing tacks in them; she also worked as an assembler in the cabinet department.
4. Plaintiff began experiencing problems with both hands and arms in June 1989 when she complained of tenderness along the radial aspect of the left wrist in a visit with Dr. Larry G. Anderson. Plaintiff was subsequently diagnosed with bilateral carpal tunnel syndrome in January 1990 by Dr. Anderson.
5. Dr. Anderson provided a splint for plaintiff's use on her right hand and recommended light duty work. Plaintiff continued to work.
6. On June 1, 1990 plaintiff referred herself to Dr. William Sims, a specialist in neurological surgery. At this time, plaintiff relayed a history of pain in her hands and arms and that her hands would become numb at night. Dr. Sims' physical examination revealed no muscle atrophy, normal strength and an ultimate diagnosis of bilateral carpal tunnel syndrome, which he related to plaintiff's work with defendant-employer.
7. On July 18, 1990, Dr. Sims performed carpal tunnel release surgery on plaintiff's right hand. Indications of the surgery revealed that the median nerve had been entrapped for a while.
8. Plaintiff continued post-operative treatment with Dr. Sims and as of August 1990, physical therapy was recommended due to plaintiff's complaints of swelling and tenderness in her right hand.
9. On October 1, 1990, plaintiff was referred to an occupational therapist at The Work Recovery Center. The notes from these visits reflect that plaintiff's condition was improving, that she was motivated and complied with treatment. The therapist recommended light duty work with decreased repetitive motion when plaintiff was ready to return to work.
10. This particular mode of treatment was suspended by the claims adjuster for defendants by letter dated October 11, 1990, pending a second opinion. Dr. Sims opined in his deposition testimony that the suspension of the occupational therapy set plaintiff back in her progress and delayed any return to work.
11. By letter dated May 13, 1991, Dr. Sims assigned a 15% permanent partial disability rating to plaintiff's right hand. Dr. Sims also opined that plaintiff would have had a 5% disability rating had specialized treatment been continued.
12. Cranbrook Claims Management, on behalf of defendants, referred plaintiff to Dr. Donald Glugover, and she had her first visit with him on October 15, 1990. Upon examination, Dr. Glugover found that plaintiff had a limitation of proximal interphalangeal joint motion and a contracture of the fifth pip joint of the right hand. He also diagnosed plaintiff with reflex sympathetic dystrophy. Dr. Glugover ordered a brace for plaintiff's right hand and noted that plaintiff exhibited symptoms of carpal tunnel syndrome in her left hand as well. Plaintiff was referred to physical therapy at Valdese General Hospital.
13. On January 16, 1991, Dr. Glugover performed carpal tunnel release surgery on plaintiff's left hand. He found that plaintiff had a definite flattening in the nerve that was caused by the tight transverse carpal ligament. The pressure in the veins that surround the nerve was relieved by the surgical procedure performed.
14. Dr. Glugover opined that plaintiff's carpal tunnel syndrome was caused by irritation within the carpal canal and that repetitive motion was the most probable etiology for her condition, with respect to both hands. His opinion was based on plaintiff's occupational history, and even though plaintiff also had a history of diabetes, Dr. Glugover related plaintiff's carpal tunnel syndrome to her work with defendant-employer.
15. Plaintiff was seen post-operatively in late January 1991, at which time she exhibited symptoms of depression. Towards the end of February, plaintiff was making good progress but still seemed "down", so Dr. Glugover prescribed a mood elevating medication.
16. On her March 18, 1991 visit with Dr. Glugover, plaintiff was still complaining of pain, so Dr. Glugover ordered EMG studies of the left hand to rule out continuing irritation of the median nerve. The findings of that study revealed that the median nerve had recovered from the injuries the carpal tunnel condition had caused to it.
17. By letter dated March 20, 1991, Dr. Glugover allowed plaintiff a trial return to work in two weeks with no repeated flexion/extension activities; no repetitive gripping; no use of vibratory tools and no lifting of more than three to five pounds. He also suggested that in another two weeks, plaintiff should attempt to return to her previous occupation, even though in his opinion, he did not feel she would be able to do so. In April and May 1991, Dr. Glugover issued work restrictions for plaintiff which consisted of no repetitive flexion or extension of either wrist and no repetitive pinch or medial grasp of either hand.
18. Dr. Glugover assigned plaintiff a 5% permanent partial disability rating to her left hand and a 15% permanent partial disability rating to the right hand.
19. On May 10, 1991, Vickie Cranford, personnel manager for defendant-employer, mentioned to plaintiff the availability of a puttying job at the plant. This job consisted of inspecting pieces of wood weighing from three ounces to fifteen pounds, and applying putty into holes in the wood by using a putty knife. The dried putty would then be sanded off.
20. Even though this job could conceivably be done without flexion and extension of the wrist, plaintiff was unable to perform said job because, having worked in that position previously, plaintiff knew she could not squeeze and mash the putty knife with the amount of force required to perform the task successfully. In fact, on September 7, 1993, Dr. Glugover would not approve the puttying job description for plaintiff because the repetitive hand and wrist motion would not be medically advisable, and because the risk of recurrent carpal tunnel syndrome would be augmented by such repetitive motion.
21. The puttying job offered by defendants on May 10, 1991 was not suitable for plaintiff, and plaintiff was justified in refusing to accept said employment. No other job offers were made to plaintiff by defendant-employer.
22. In July 1991, Dr. Richard Marcus, referred to plaintiff by Dr. Sims, performed a Finkelstein clinical test which revealed indications of deQuervain's syndrome of plaintiff's left thumb. This syndrome is tenosynovitis of the extensor and abductor muscles to the thumb which effect a person's ability to perform pinch grasps of any object and would also effect deviation of the wrist from the neutral position.
23. Since the spring of 1991 up until the time of the hearing, plaintiff experienced numbness and tingling in her left and right hands and sleeps with a brace. She cannot open a car door with her left hand, cannot lift a pot of water onto the stove, or open bottles or jars. Plaintiff cannot squeeze out a mop or pick up a gallon of milk. She performs some therapy on her own at home and takes over-the-counter pain medications for relief.
24. At the time of the hearing, plaintiff had not performed a job search and had not applied for any jobs because of her age and her inability to work. She did however, indicate a willingness to return to work at a job within her medical restrictions.
25. As a result of plaintiff's injury, she was incapable after her injury of earning the same wages she had earned before her injury in the same or any other employment
* * * * * * * * * * *
Based on the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. As a result of plaintiff's injury, she was incapable after her injury of earning the same wages she had earned before her injury in the same or any other employment. N.C. Gen. Stat. § 97-2 (9);Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982).
2. Once the plaintiff has met the initial burden of proving that her wage earning capacity has been impaired by her injury, and is thus disabled, there is a presumption that plaintiff's disability continues until the employee returns to work at wages equal to those she was receiving at the time the injury occurred.Watson v. Winston-Salem Transit Authority, 92 N.C. App. 473;374 S.E.2d 483 (1988).
3. Defendants have not produced evidence that there are suitable jobs actually available to the plaintiff, and have not made a suitable offer of employment within plaintiff's medical restrictions and vocational limitations. Burwell v. Winn-DixieRaleigh, 114 N.C. App. 69 (1994).
4. Plaintiff is entitled to payment by defendant of all medical expenses arising from her compensable injury. N.C. Gen. Stat. § 97-25.
5. Plaintiff is entitled to continuing temporary total disability benefits from defendants at the rate of $185.61 per week from June 17, 1990 until such time as plaintiff is able to return to gainful employment suitable to her capacity, has a change in condition, or until further order of the Commission. N.C. Gen. Stat. § 97-29. If plaintiff has returned to work, plaintiff is not entitled to temporary total disability payments after her date of returning to work.
6. Defendants are entitled to a credit for disability payments made to plaintiff from July 24, 1990 through June 5, 1991.
* * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Subject to counsel's fee, defendants shall pay to plaintiff in one lump sum temporary total disability benefits at the rate of $185.61 from July 17, 1990 up to the date of this Order and continuing each week thereafter until such time as plaintiff is able to return to gainful employment suitable to her capacity, has a change in condition, or until further order of the Commission. Defendants shall receive a credit for disability payments made to plaintiff from July 24, 1990 through June 5, 1991.
2. Defendants shall pay expenses for medical treatment resulting from plaintiff's compensable injury.
3. A reasonable attorney's fee of 25% of the compensation awarded plaintiff herein shall be deducted and paid directly to plaintiff's counsel. Plaintiff's counsel shall receive a lump sum amount from the initial award, and every fourth check thereafter.
4. Defendants shall pay the costs due the Commission.
FOR THE FULL COMMISSION
 S/ ______________________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ ______________________________ J. RANDOLPH WARD COMMISSIONER
S/ ______________________________ DIANNE C. SELLERS COMMISSIONER
CMV/mj 9/3/96